## JAMES BENNETT *v.* THE STATE.

1. CHARGE OF THE COURT.— In cases of felony, it is well settled in this State that the trial judge, whether asked or not, must give in charge to the jury the law of the particular case as made by the evidence adduced at the trial, and the law as to every legitimate issue arising on the facts in proof. Failure of the judge to discharge this duty correctly is ordinarily cause for reversal of a conviction for felony.

2. SAME — MURDER — SELF-DEFENSE.— Appellant was convicted of murder in the second degree upon proof which showed a case of mutual combat wherein the deceased, an unarmed man who was larger than the defendant, was killed by the latter with a knife. Besides expounding to the jury the law of murder and manslaughter, the trial court gave them in charge the law of self-defense, comprising therein the provisions of the Penal Code applicable to cases in which, to justify homicide in self-defense, the slayer must previously resort to all means of prevention save retreat. Note the state of proof on which it is *held* that that portion of the charge was not only correct in the abstract but applicable to the case as made by the evidence.

3. MANSLAUGHTER — MURDER.— Note also the instruction on the distinctions between murder and manslaughter, which is *held* correct as law and germane to the proof.

APPEAL from the District Court of Johnson. Tried below before the Hon. J. ABBOTT.

The indictment was presented on June 3, 1880, and charged that the appellant, on May 20, 1880, did, of his malice aforethought, wilfully and feloniously kill and murder John Waggoman, with a certain knife. The cause came to trial in December, 1881, when the appellant was found guilty of murder in the second degree, and his punishment assessed at a term of five years in the penitentiary.

It appears that the appellant and John Waggoman, the deceased, were young men who, with several others, were engaged as herders of cattle, and the conflict between them which terminated in the death of Waggoman was the result of a disagreement between them in respect of their duties as herders. There were several witnesses to the combat, and their accounts of it vary in some of the particulars.

W. H. Oliver, the first witness for the State, testified that John Waggoman was killed by the defendant, in Johnson county, on May 20, 1880. Defendant, deceased, witness, and four other men named Nauls, Fry, Stephens and Dunlap were engaged in driving a herd of cattle, and on that day they stopped about three and a half miles south of the town of Cleburne. Fry, Stephens, the defendant and witness were sitting down at camp, having just finished their dinner, when the deceased rode up and delivered a message from Mr. Nauls, who was the "boss" of the herd. Witness thought that the deceased dismounted from his horse, and afterwards got on the horse again and started to ride off in the direction of the herd. Witness and his companions began to joke the deceased. The defendant said something to deceased which the witness could not recall, and afterwards said to the deceased, "I understand that you said that you got off of your horse to whip me, this morning;" to which the

deceased made a reply not remembered by the witness; and the defendant said to the deceased, "I want you to quit talking about me,— if you don't we will mix." Deceased replied, "We can mix now," and immediately got off of his horse and turned around. He was at his horse's hip on the side at which he dismounted, when the defendant met him, and the deceased immediately struck the defendant with his fist on the head, and staggered him. Witness saw the defendant striking the deceased, but did not know that defendant had a knife until he saw blood on defendant's left arm. Witness saw the deceased strike the defendant but the one time, but saw him back two or three steps and throw up his arm. Defendant struck the deceased rapidly, and the latter turned away; and as he did so, the defendant cut him in the back. The deceased, as witness thought, went a little away and turned around, and then fell dead. He was cut in the heart, and on the left arm, the collar bone, and in the back. Witness went for Mr. Nauls, and when he came back the defendant was gone. Deceased had the appearance of a much larger man than defendant, and was a quick-spoken man. Witness thought there was going to be a fuss. When the deceased dismounted, he and defendant were twelve or fifteen feet apart. Defendant advanced three or four steps, and met the deceased at the hip of the horse.

L. B. Nauls, for the State, testified that he was the "boss" of the herd. He knew that the deceased and the defendant had had some fuss about standing on watch at night. Witness told them they must drop it, and they promised to do so, the day before the killing. Some days before that, witness told the deceased that he had better let that boy, Bennett, alone; that he, the deceased, was mistaken if he thought Bennett a coward; that he, witness, knew the defendant would fight, for he came of good stock. To see the deceased walking around, he

seemed to be a much larger and stouter man than defend-ant; but witness, when he saw the deceased stripped, was astonished to see how lean he was, and how small his muscles. On account of the ill-feeling , between deceased and defendant, the witness had changed their watch so that they would not have to wake each other up. The ill-feeling between them was caused by a fuss they had; defendant claimed that the deceased waked him up too soon, to stand guard. Witness, when Oliver came for him, hastened to camp, and there found the deceased, dead, lying on his face. He was cut in the heart and on the collar bone, shoulder and arm; there was a long gash between his ribs, and an up-and-down cut near and on the right of his backbone. Deceased had no weapons about him, except a pocket knife, which was in his pocket, closed. He was over six feet in height, but very thin, slender, and small muscled.

Dr. Greenwall, for the State, testified that he saw the deceased after he was laid out. Deceased was lean and his muscles small; but this did not prevent him from being a man of ordinary strength for his size.

Dr. Merrett, for the State, testified that he also saw the body of the deceased, who looked lean and dyspeptic, with small and flabby muscles; which appearance may have been caused by loss of blood. Deceased looked like he would weigh 135 or 140 pounds.

The State having rested, B. F. Stephens was the first witness introduced by the defense. He stated that he was present when the deceased came to the camp and delivered the message from Nauls. Deceased · had dis-mounted, but soon got on his horse, and as he started to ride off the witness and his comrades commenced joking him, and he joked back. Defendant passed some joke at deceased, and the latter flew mad and cursed the defend-ant. Speaking to the deceased, the defendant said: "Waggoman, I understand you said that you got down to

whip me this morning." Deceased replied, "I did not say that, but I'll tell you what I did say, Bennett; I got down to give you anything you wanted." Defendant said, "I don't want any fuss with you; but if you do not quit talking about me we will mix." The deceased answered, "We can mix now," and immediately rode around to the rear of the defendant, and dismounted on the side opposite the latter. Witness picked up his bridle and started on a run to his horse, which was about seventy-five yards off, and was looking back at the others, and hallooing and laughing at them. When he reached his horse he looked back and saw the defendant and the deceased fighting; and when witness got back to them the deceased was dead. Witness's description of the wounds on the deceased was the same as Oliver's. Defendant got his horse and went off. Witness had left his pocket knife lying where the defendant was sitting when the deceased came up, and the defendant was whittling some onion tops with the knife. It was an ordinary pocket knife, and when witness came back from his horse the defendant had the knife, and witness saw blood upon it. Defendant said to witness, "Waggoman might have let me alone." After the defendant left, the witness saw him no more until he saw him in the court-house, the next fall. Witness said he could not hear very well.

L. W. Fry, testifying for the defense, gave nearly the same account of the matter as the others. He saw the defendant whittling onion tops with Stephens's knife, when the deceased came up. The deceased spoke angrily. When the deceased fell, the defendant said, "Now I have played h—ll," and commenced crying. Witness gave defendant $3.75, and told him to leave.

James Dunlap, for the defense, repeatedly heard the deceased say he was tired of standing guard his own time and Bennett's too; and heard deceased say he would stamp the life out of Bennett if the latter would not do

right. In the morning of the day the killing occurred, witness was with the deceased, and the defendant rode up and, speaking to the deceased, said, "I suppose you said that I got lost from the herd last night." The deceased replied, "Yes, you did." Defendant said, "I did not." Deceased got off his horse, and defendant turned and rode off. Witness asked the deceased what he got off his horse for, and the latter said he intended to pull the defendant off his horse, and stamp the life out of him. Witness told this to defendant before the killing, and told him to be on his guard. Defendant said, "Pshaw. I knew Waggoman to be a strong man, for I have seen him handling cattle." Deceased was a much larger man than defendant.

Thomas Estis, for the defense, testified that the deceased was six feet four inches high and weighed one hundred and seventy-eight pounds; and his reputation was that of a dangerous man. He had lived with the witness.

A number of witnesses stated that they had known defendant since he was a small boy, and his reputation where he was raised was that of a quiet and peaceable boy. At the time of the homicide the defendant was about nineteen years old, and he was then puny and sickly. He engaged in the cattle drive under advice that it might improve his health. It was admitted that defendant voluntarily surrendered himself in December, 1880.

In rebuttal, the State introduced the father of the deceased, who testified that he lived in Mississippi, and that his son, the deceased, left Mississippi about three years before he was killed. The State proposed, and, over objection by the defense, was allowed to prove by the witness that up to the time the deceased left Mississippi he was reported to be a kind, quiet and peaceable boy. The objections of the defense to this proof were immateriality

and because the proof of reputation was too remote in point of time. The defense reserved exceptions to its allowance. The witness stated that the deceased, when killed, was about twenty-four years of age.

The 26th section of the charge of the trial judge to the jury is referred to in the opinion and the 3d head-note. It was as follows:

"But mere rage, passion or mental excitement, however great the excitement or ungovernable one's temper may be, unless the same arises from an adequate cause, such rage, passion or mental excitement will not mitigate or reduce to manslaughter an unlawful and voluntary homicide. If the homicide is voluntary and designed, though such design may have its first inception in an inflamed and excited mind, incapable of cool reflection and deliberate action, and such design is carried into execution before there is time for the passion or excitement to abate, and death result from such design, such killing is murder of the second degree, and not manslaughter, unless such passion or excitement result from an adequate cause; and in such case, if there should be time for the mind to become cool and deliberate, and capable of considering and understanding the nature and consequence of the act so designed, before the same is carried into execution, and the act of killing is the result of such design, such killing will be with express malice and murder of the first degree, unless the same was done under circumstances which mitigate, excuse or justify the act as before explained."

As already stated, the appellant was found guilty of murder in the second degree, and consigned to the penitentiary for five years.

*Anderson & Flint,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

WINKLER, J.   The appellant was tried and convicted of murder in the second degree, and was sentenced to the penitentiary, on an indictment charging him with the murder of John Waggoman, alleged to have been committed in Johnson county, on May 20, 1880.

Counsel, in the brief filed in this court on behalf of the appellant, complain of the charge of the court, which they concede to be abstractly correct, but contend was not applicable to the case at bar.   They submit further that all that is stated in the charge about the means or instrument used, the intent, formed design, and calm deliberate mind, while abstractly right, is not applicable; and also to the same effect as to that portion of the charge which indicates that if the mind is sufficiently cool and self-possessed as to understand, etc., it matters not with what haste or speed the design is carried into execution.

They also concede that the charge on manslaughter was correct.   They say: "Then the court, after having fully charged on the degrees of murder and manslaughter, had certainly charged all that should have been charged;— but, in subdivision 26, the court proceeds to again direct the attention of the jury to the degrees of murder as contradistinguished from manslaughter, and in a manner we think calculated to impress the jury with the belief that the court was of opinion that appellant's offense was that of murder in the second degree.   At least it puts it in a manner to give undue prominence to murder in the second degree."   They further argue that the charges asked by the defendant should have been given to the jury.

Thus it will be seen that the principal reliance for a reversal of the judgment of the court below is placed on the applicability of the charge to the evidence adduced on the trial, and on the repeating of the charge and giving undue prominence to the subject of murder of the second degree,— including the sufficiency of the testimony to support the verdict.

The law is well settled in this State at least (however courts may have held where the judges are not prohibited from charging upon the weight of the testimony or summing up the evidence, as they are in this State), that it is the duty of trial judges to instruct the juries in all cases of felony as to the law of the case as made by the evidence adduced upon the trial of the particular case, and as to every legitimate issue arising upon the facts; and that a failure of the trial judge to so instruct the jury, and instruct them correctly, as to every legitimate issue properly arising upon the testimony adduced at the trial, would ordinarily be cause for a reversal of the judgment, it being required by the statute law that, "After the argument of a criminal cause has been concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case; but he shall not express any opinion as to the weight of evidence, nor shall he sum up the testimony. This charge shall be given in all cases of felony, whether asked or not." Code Crim. Proc. art. 677.

Judging from the record before us, the charge of the court in the present case was not only an able but an accurate enunciation of the law as applicable to the facts proved on the trial, both as to the two degrees of murder, as well as on the subject of manslaughter, and homicide in self-defense. The only apparent criticism to which it is subject is that portion of the charge on self-defense which is in the language which we italicise: "If the evidence in this case shows that the defendant killed the deceased Waggoman, and if it further shows that, at the time he did so, said Waggoman was making upon him an unlawful and violent attack of such character as to produce in his mind a reasonable expectation or fear of death or of serious bodily injury, *and that he used all reasonable means at his command to prevent the threatened injury before taking life, except to retreat,* and that he

killed said Waggoman at the very time that said Waggo-
man was making said attack upon him, he would in law
be justifiable, and you should acquit him.   A man is not
bound to retreat in order to avoid the necessity of taking
the life of a party who is making upon him an unlawful
and violent attack of such a character as to produce in
his mind a reasonable apprehension or fear of serious
bodily injury, but, *before he will be justified in law in
taking the life of his assailant, he must resort to all other
means to avoid the necessity of taking life, except he is
not bound to retreat.*"

The sufficiency and correctness of a charge must always
be tested by the law of the case and by the facts proved.
The law applicable to the present inquiry is as follows:
"Homicide is permitted in the necessary defense of per-
son or property under the circumstances and subject to
the rules herein set forth."   Penal Code, art. 569.

"Homicide is permitted by law when inflicted for the
purpose of preventing the offense of murder, rape, rob-
bery, maiming, disfiguring, castration, arson, burglary
and theft at night, or when inflicted upon a person or
persons who are found with deadly weapons and in dis-
guise in the night time on premises not his or their own,
whether the homicide be committed by the party about
to be injured or by some person in his behalf, when the
killing takes place under the following circumstances:
1. It must reasonably appear by the acts, or by words
coupled with the acts of the person killed, that it was the
purpose and intent of such person to commit one of the
offenses above named.   2. The killing must take place
while the person killed was in the act of committing the
offense, or after some act done by him showing evidently
an intent to commit such offense."   Following these are
seven clauses which have no application to the present
case.   Penal Code, art. 570.   "When a homicide takes
place to prevent murder, maiming, disfiguring, or castra-

tion, if the weapons, or means used by the party attempting to commit such murder, maiming, disfiguration, or castration, are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury." Penal Code, art. 571. "Homicide is justifiable also in the protection of the person or property against any other unlawful or violent attack besides those mentioned in the preceding article, and in such cases all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack, and the person interfering in such a case, in behalf of the party about to be injured, is not justifiable in killing the aggressor unless the life or person of the injured party is in peril by reason of such attack upon his property." Penal Code, art. 572. The succeeding two articles of the Penal Code would or would not have bearing upon the question under consideration, according to the circumstances, but need not be here cited.

From art. 571, as above cited, it will be seen that under the circumstances stated in that article the person accused of the homicide is not required to resort to any other means in order to avoid the injury, before resorting to the extreme measure of taking the life of the assailant; whilst in the class of cases mentioned in article 572, the law requires that all other means of preventing the injury must be resorted to before the law will protect the slayer in taking life.

The charge under consideration was correct under article 572, in that there was no proof that the weapons or means used were such as would have been calculated to kill the defendant, as required by the former article. So that the charge was correct under the proof, and the criticism, if any, to which it is subject is a want of observing the difference between the two articles, which could not have prejudiced the rights of the defendant.

- We find no error in paragraph 26 of the charge, and the error complained of in the ruling upon the evidence is not of sufficient importance to warrant a reversal of the judgment; and the same may be said as to the ruling of the court on the motion in arrest of judgment.

Believing that no material error was committed on the trial below, the judgment must be affirmed.

*Affirmed.*